UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

CONRAD J. DESANTIS,                                    Case No.: 15-31017-PGH

     Debtor.                                                   Chapter 7

_____/

CORDELL FUNDING, LLLP,

     Plaintiff,

vs.                                                              Adv. No. _____

CONRAD J. DESANTIS,

     Defendant.

_____/

**ADVERSARY COMPLAINT OBJECTING TO DISCHARGEABILITY OF DEBTS
PURSUANT TO 11 U.S.C. § 523(a)(2)(A) and (B)**

Plaintiff, Cordell Funding, LLLP ("Cordell") sues Defendant, Conrad J. DeSantis (the

"Debtor" or "Defendant") and alleges as follows:

**JURISDICTION, VENUE AND THE PARTIES**

1.     This is a proceeding brought by Cordell objecting to the dischargeability of debts

pursuant to 11 U.S.C. § 523(a)(2)(A) and (B).

2.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.

3.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      This adversary proceeding is commenced pursuant to Rule 7001(6) of the Federal Rules of Bankruptcy Procedure.

6.      Cordell is a Florida limited liability limited partnership.

7.      The Debtor is an individual residing in Palm Beach County, Florida.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.      Personal Financial Statement Misrepresentations.

8.      In December 2005 Cordell made a loan of $3.5 million to North Andros Assets, Ltd. ("NAAL").  The proceeds from the loan were used to acquire certain real property in the Bahamas, which served as collateral to secure the subject loan.

9.      The Debtor executed a written personal guarantee of the loan.

10.     On or about December 12, 2005, in connection with the loan and guarantee, the Debtor furnished a personal financial statement to Cordell (the "PFS").  A copy of the PFS is attached as **EXHIBIT "A"**.

11.     At the time the PFS was executed, the Debtor owned a fifty percent membership interest in CDSJ, LLC, a Florida limited liability company.

12.     At the time the PFS was executed, CDSJ, LLC owned real property at 843 W. 13 Ct., Riviera Beach, Florida 33404 (the "Property").

13.     The Debtor disclosed the Property in Schedule E of the PFS (the "Property").  The Debtor valued the Property at $480,000 in the PFS.

14.     The Debtor did not disclose any mortgages encumbering the Property in the PFS.

15.     However, the Property was encumbered by two mortgages as of December 2005: a mortgage in the original principal amount of $1.199 million in favor of Grand Bank & Trust of

Florida ("Grand Bank"), and a mortgage in the original principal amount of $195,000 in favor of Fidelity Federal Bank & Trust ("Fidelity").

16.    CDSJ, LLC lacked equity in the Property as of December 2005.

17.    Upon information and belief, the Debtor personally guaranteed the debts payable from CDSJ, LLC to Grand Bank and Fidelity.  The Debtor did not disclose those guaranties in the PFS.

**B.    Fraudulent Transfer of the Law Star Interest.**

18.    As of December 2005 the Debtor owned a forty percent membership interest (the "Law Star Interest") in Law Star, LLC, a Florida limited liability company ("Law Star").

19.    Subsequently, NAAL defaulted on its debt owed to Cordell.  In April 2007 Cordell commenced an action against the Debtor in the Circuit Court of Palm Beach County, Florida to enforce the terms of the guarantee (the "Lawsuit").

20.    On or about November 11, 2008, while the Lawsuit was pending, the Debtor caused Law Star to reissue its equity such that the Law Star Interest was owned by the Debtor and his wife, Patricia DeSantis ("Mrs. DeSantis"), as tenants by the entirety instead of by the Debtor individually (the "Law Star Transfer").  By doing so, the Debtor transferred a property interest from himself to Mrs. DeSantis with the intent to hinder, delay or defraud his creditors, including Cordell.

21.    The Law Star Transfer was to insiders.

22.    The Debtor retained possession and control of the Law Star interest.

23.    The Law Star Transfer was not disclosed to Cordell as required by the PFS, but was concealed.

24.     Before the Law Star Transfer was made, Cordell had filed the Lawsuit.

25.     The Law Star Transfer was of substantially all of the Debtor's non-exempt assets.

26.     The Debtor removed and concealed the Law Star Interest from his creditors, including Cordell.

27.     The Debtor received no consideration in exchange for the Law Star Transfer.

28.     The Debtor was insolvent or became insolvent shortly after the Law Star Transfer was made.

29.     The Law Star Transfer was made shortly after the Lawsuit was filed.

30.     Pursuant to the PFS, the Debtor agreed to notify Cordell immediately in writing of any significant adverse changes to his financial condition.

31.     The Debtor did not immediately notify Cordell in writing of the Law Star Transfer.

32.     In December 2009 Cordell and the Debtor executed a stipulation for settlement to resolve the Lawsuit (the "Stipulation"). Among other things, the Stipulation provided for the sale of Cordell's collateral and also capped the Debtor's liability on the guaranty at $2.5 million dollars. A copy of the Stipulation is attached as **EXHIBIT "B"**.

33.     In July 2015, following the sale of the property referenced in the Stipulation, Cordell obtained a deficiency judgment in the principal amount of $2.5 million against the Debtor. A copy of the judgment is attached as **EXHIBIT "C"**.

34.     The earliest the Law Star Transfer was discoverable was after the judgment was entered against the Debtor, or after the Debtor's bankruptcy was filed.

35.     The Law Star Transfer constitutes an actual fraudulent transfer under Florida Statute § 726.105(1)(b).

36.     Cordell was damaged by the Debtor's actual fraudulent transfer of the Law Star Interest.

## COUNT 1
## OBJECTION TO DISCHARGEABILITY
### 11 U.S.C. § 523(a)(2)(A)

37.     Cordell re-alleges and incorporates the allegations in paragraphs 1–36 above as if fully set forth herein.

38.     The Debtor obtained the Law Star Interest by fraudulently transferring it from himself, individually, to himself and Mrs. DeSantis as tenants by the entireties. This transfer has allowed the Debtor to contend the Law Star Interest is exempt from execution by creditors.

39.     The Debtor benefitted from the Law Star Transfer by attempting to convert a non-exempt asset into an exempt asset.

40.     The Debtor made the Law Star Transfer with actual intent to hinder, delay or defraud his creditors.

41.     Cordell has sustained damage as a result of the Debtor's actual fraud.

WHEREFORE, Cordell requests the entry of a non-dischargeable judgment against the Debtor in the amount of the value of the Law Star Interest, and for such other relief as this Court deems equitable, just and proper.

## COUNT II
## OBJECTION TO DISCHARGEABILITY
### 11 U.S.C. § 523(a)(2)(B)

42.     Cordell re-alleges and incorporates the allegations in paragraphs 1–36 above as if fully set forth herein.

43.     The PFS was materially false with respect to the Debtor's financial condition in December 2005 and December 2009.

44.     Cordell reasonably relied on the PFS in (a) issuing a loan to NAAL that was guaranteed by the Debtor and (b) entering into the Stipulation.

45.     The Debtor caused the PFS to be made with intent to deceive.

WHEREFORE, Cordell requests the entry of a judgment deeming its claim related to the Judgment to be non-dischargeable, and for such other relief as this Court deems equitable, just and proper.

Dated:  May 31, 2016

SHRAIBERG FERRARA LANDAU & PAGE, P.A.
Attorneys for Cordell Funding, LLLP
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email:  jpage@sfl-pa.com
Email:  pdorsey@sfl-pa.com

By:    /s/ John Page
          John Page
          Fla. Bar No. 0860581
          Patrick Dorsey
          Fla. Bar No. 0085841

# EXHIBIT "A"

12/12/2005  16:07    561-627-8649          DGSS LAW FIRM-FAX 2              PAGE  02/05

# PERSONAL FINANCIAL STATEMENT

Robin Rodriquez

The following is my/our statement of all assets and liabilities as of the _12_ day of _December, 2005_ submitted to ~~Great Bank & Trust of Flori~~

| APPLICANT PERSONAL INFORMATION | JOINT OWNER OF ASSETS |
|---|---|
| Name  Conrad J. DeSantis | Name  Patricia G. DeSantis |
| Social Security # | Social Security #                    DOB 7/18/40 |
| Residence Address 1125 Country Club Drive | Residence Address |
| City, State & Zip N.P.B., Fl. 33408 | City, State & Zip |
| Position or Occupation  Attorney | Position or Occupation |
| Business Name DeSantis, Gaskil, Smith & Shenkman | Business Name |
| Business Address 11891 U.S. Hwy One | Business Address |
| City, State & Zip N.P.B         33408 | City, State & Zip |
| Res. Phone 561-622-1144 Bus. Phone 622-2700 | Res. Phone                Bus. Phone |

## STATEMENT OF FINANCIAL CONDITION

| ASSETS | ASSETS SOLELY OWNED (IN DOLLARS) | ASSETS JOINTLY OWNED (IN DOLLARS) | LIABILITIES | INDIVIDUAL (IN DOLLARS) | JOINT (IN DOLLARS) |
|---|---|---|---|---|---|
| Cash on hand and in banks – Schedule A | | 1,198,940 | Notes payable to banks – Schedule A | | 521,000 |
| Cash value – life insurance – Schedule B | | | Due on credit cards– Schedule G | | 0 |
| U.S. Government Securities – Schedule C | | | Notes payable to others –Schedule G | | 0 |
| Marketable securities – Schedule C | | 35,000 | Loans on insurance policies | | 0 |
| Other assets readily convertible to cash | | | Unpaid income tax | | 0 |
| Total current assets | $ | $ | Total current liabilities | $ | $ |
| Non-marketable securities – Schedule C | 1,320,000. | | Real estate mortgages – Schedule E | | |
| Partial interest in real estate – Schedule E | | | Liens and assessments payable | | 0 |
| Real estate owned – Schedule E | | 3,140,000 | | | |
| Loans receivable – Schedule D | 360,900 | | Other debts – Itemize: | | 0 |
| Autos & personal property – Schedule F | | 66,800 | | | |
| Vested pensions/IRA – Schedule A | 1,932,000 | | | | |
| Other assets – Itemize: | | | | | |
| | | | TOTAL LIABILITIES | $ | |
| TOTAL ASSETS SOLELY OWNED | $ | | NET WORTH | $ | |
| TOTAL ASSETS JOINTLY OWNED | $ | | TOTAL LIAB. & NET WORTH | $ | |

## INCOME STATEMENT – FOR THE YEAR ENDED _____
## ATTACH MOST RECENT YEAR'S TAX RETURN
Income Tax Paid Through _____

| ANNUAL INCOME | ANNUAL EXPENSES | |
|---|---|---|
| Salary  See Income Tax Returns | Home Mortgage (principal and interest) | 0 |
| Bonus and Commissions  Attached - 2003 + 2004 | Other Loan Payments | 0 |
| Interest | Income & Property Taxes | |
| Other Income – Itemize (Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying the obligation) | Alimony, Child Support, Separate Maintenance | 0 |
| | Other Expenses – Itemize: | |
| | | |
| | | |
| | | |
| TOTAL INCOME: | TOTAL EXPENSES: | |

| GENERAL INFORMATION | CONTINGENT LIABILITIES | |
|---|---|---|
| Are Any Assets Pledged? ☐ No ☐ Yes | As Endorser, Co-maker or Guarantor  $ | |
| Are you a Defendant in any Suits or Legal Actions ☒No ☐ Yes | On Leases or Contracts | $ |
| (Explain): | Legal Claims | $ |
| Have you been declared Bankrupt in the last 10 years? ☒No ☐ Yes | Federal - State Income Taxes | $ |
| (Explain): | Other: | $ |

12/12/2005  16:07    561-627-8648        DGSS LAW FIRM-FAX 2        PAGE  03/05

(ATTACH SEPARATE SHEET TO COMPLETE SCHEDULES, IF NECESSARY)

**SCHEDULE A    CASH IN BANKS AND NOTES DUE TO BANKS** (Do not include real estate loans - See Schedule E)

| Name of Bank | Type of Account | Type of Ownership | On Deposit | Notes Due Banks | Payment Amount | Collateral (if any) & Type of Ownership |
|---|---|---|---|---|---|---|
| Colonial Bank | | | $ 282,090 | $ — | $ — | — |
| " " | | | 313,810 | | | |
| | | | 586,633 | | | |
| | | | 6,652 | | | |
| | | | H, 845 | | | |

**SCHEDULE B    LIFE INSURANCE** (List only those Policies that you Own)

| Company | Face of Policy | Cash Surrender Value | Policy Loan from Insurance Co. | Other Loans Policy as Collateral | Beneficiary |
|---|---|---|---|---|---|
| Minnega | $ 500,000 | $ ? | $ O | $ O | Patricia. G. |

**SCHEDULE C    SECURITIES OWNED** (Including U.S. Government Bonds and all other Stocks and Bonds)

| Face Value – Bonds OR # of Shares – Stock | Description of security | Type of Ownership | Cost | Market Value US Govt Sec. | Market Value Marketable Securities | Market Value Non-Marketable Securities | Amount Pledged to Secured Loans |
|---|---|---|---|---|---|---|---|
| Smith Barney | Statement | Attached | $ | $ | $ 351,000. | $ | $ |
| Smith Barney – 401 K – Stat. Attached | | | | | $1,930,000. | | |
| Bahama Golf & Waterspods Resorts – 90000, Shares | | | | | | $ 1,080,000. | |
| DSantos Gaskill. Smith & Shoakman + 48% | | | | | | $ 240,000. | |

**SCHEDULE D    NOTES AND ACCOUNTS RECEIVABLE** (Money Payable or Owed to You Individually - Indicate by a ✓ if Others have an Ownership Interest)

| Maker/Debtor | ✓ | When Due | Original Amount | Balance Due Good Accounts | Balance Due Doubtful Accounts | Balance Due Notes Relatives/Friends | Security (if any) |
|---|---|---|---|---|---|---|---|
| 1st mortgage | | Now - | $ 275,000 | $ | | $ | 1st mortgage |
| 1st + BMO (Mbyta). | | Now | 90,000 | | | | 1st + 2nd Mortgage |

**SCHEDULE E    REAL ESTATE OWNED**                                                    **MORTGAGE PAYABLE**

| Title in Name of | % owned | Description & Location of Property | Date of Purchase | Original Cost | Property Value | Balance Due | Payment Amount | Maturity Date |
|---|---|---|---|---|---|---|---|---|
| Conrad & Patraiava | 100 | Home - N.P.B. 1125 Country Club. | | $ | $2,100,000 | O | $ — | —. |
| LBW Star Bldg. | 40% | - Office Bldg - N.P.B | 2002 | | 3,400,000 | 1,300,000 | | |
| CDLS-LLC | 50% | 17000 B¹ Warehouse Under construction | | Rawland | 480,000 | | | |

**SCHEDULE F    PERSONAL PROPERTY** (Indicate by a ✓ if Others have an Ownership Interest)    **LOANS ON PROPERTY**

| Description | ✓ | Date Purchased | Original Cost | Current Value | Balance Due | Payment Amount | To Whom Payable |
|---|---|---|---|---|---|---|---|
| Automobiles- Acura. 2005 | | | $ 46,000. | $ | $ O | O | — |
| BMW. V98 | | | 80,000 | | O | O | |

**SCHEDULE G    NOTES, ACCOUNTS, BILLS, & CONTRACTS PAYABLE** (Other than Bank, Mortgage and insurance Co. Loans)

| Payable To | Original Balance | Current Balance | Loan Type | Payment amount | Maturity date | Collateral |
|---|---|---|---|---|---|---|
| NONE | $ | $ | | $ | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

The information contained in this statement is provided for the purpose of obtaining or maintaining credit with the bank on behalf of the undersigned , or for a business entity in whose behalf the undersigned may either jointly or severally with others execute a guaranty in its favor. Each undersigned understands that the bank is relying on information provided herein in deciding whether to grant credit and represents and warrants that the information provided is true and complete. Any willful misrepresentation could result in a violation of Federal law (Sec. 18 U.S.C. 1014). The undersigned also agrees to notify the bank immediately in writing of any significant adverse change in such financial condition. The bank is authorized to make all inquiries it deems necessary to verify the accuracy of the statements made herein and to determine my/our creditworthiness.

Date Signed 12 / 12 / 05   Signature _____   Signature _____

Applicant                              Joint Owner

12/12/2005  16:07    561-627-8648        DGSS LAW FIRM-FAX 2        PAGE  04/05

# citigroup

## Select Consolidation Summary
### October 31, 2005

Your Broker/Dealer is
**CITIGROUP GLOBAL MKTS INC.**
Your Financial Consultant
DENNY COHEN / BRETT COHEN
9130 S DADELAND BLVD
SUITE 1702
MIAMI    FL 33156
305-670-2000

Select Client Center: 800-423-7248

47AJ0503661117000001012 36539464A01 TMPAFL16A
DESANTIS,GASKILL,S&S 401K PSP
LG CAP GROWTH
F&O CONRAD DESANTIS
1125 CONRAD DESANTIS
1125 COUNTRY CLUB DRIVE
N. PALM BEACH FL 33408-3737

**Summary**

We have enclosed statements for the following accounts in your consolidated household. "Total Value Comparison" and "Year to Date Summary" may contain information for previously existing accounts which have been recently consolidated. Unpriced securities are not included in the "Net Value" columns. Unless otherwise indicated, values shown are for "This Period". Accrued interest and dividends, earned but not paid, are excluded from the Adjusted Net Value. Asset Increase is defined as: Adjusted Net Value This Period-Adjusted Net Value Prior Month-Deposits + Withdrawals-Income.

| Acct/<br>Number | Abbreviated<br>Name | Account<br>Type | Total Value<br>Prior Monthly<br>Adj.Net Value | Total Value<br>This Period<br>Ad.Net Value | Net Securities<br>Deposited/<br>(Withdrawn) | Net Capital<br>Deposited/<br>(Withdrawals) | Total Income<br>Taxable<br>Non-Taxable | Asset<br>Increase/<br>(Decrease) | Unrealized<br>Realized<br>Gain or (Loss) | Adjusted YTD<br>Realized<br>Gain or (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2117 | DESANTIS,GASKILL,S&S 401K PSP<br>LG CAP GROWTH | MANAGED | $ 477,790.50<br>$ 477,790.50 | $ 460,265.51<br>$ 460,265.51 | $ 0.00 | ($ 4,900.09) | $ 0.00<br>$ 285.18 | ($ 7,429.65) | $ 17,391.10 ST<br>$ 5,198.23 LT | $ 11,669.26 ST<br>$ 5,198.23 LT |
| 2114 | DESANTIS,GASKILL,S&S 401K PSP<br>LG CAP VALUE | MANAGED | 457,895.22<br>457,895.22 | 449,200.43<br>449,200.43 | 0.00 | (3,821.92) | 0.00<br>648.19 | (7,321.06) | 14,677.32 ST<br>6,664.38 LT | 14,677.32 ST<br>6,664.38 LT |
| 2119 | DESANTIS,GASKILL,S&S 401K PSP<br>INTERMEDIATE BOND | MANAGED | 392,517.07<br>392,226.49 | 391,299.73<br>384,821.36 | 0.00 | (976.75) | 0.00<br>1,566.82 | (3,560.90) | (272.45) ST<br>(182.61) LT | (272.45) ST<br>(182.61) LT |
| 2120 | DESANTIS,GASKILL,S&S 401K PSP<br>INTERNATIONAL | MANAGED | 436,129.89<br>428,129.89 | 437,821.84<br>427,821.84 | 0.00 | (1,743.38) | 0.00<br>877.28 | 47,807.35 | 12,287.87 ST<br>3,811.47 LT | 12,287.87 ST<br>3,811.47 LT |
| 2122 | DESANTIS,GASKILL,S&S 401K PSP<br>SMALL CAP CORE | MANAGED | 208,805.53<br>208,805.53 | 208,119.15<br>208,194.15 | 0.00 | (634.36) | 0.00<br>172.25 | (6,805.37) | 8,205.40 ST<br>2,854.00 LT | 8,205.40 ST<br>2,854.00 LT |

12/12/2005  16:07   561-627-8648   DGSS LAW FIRM-FAX 2   PAGE  05/05

MR CONRAD DESANTIS  AND
MRS PATRICIA DESANTIS  JTWROS
1125 COUNTRY CLUB DR
N PALM BEACH FL 33408-3717

CITIGROUP GLOBAL MKTS INC.
Your Financial Consultant
DENNY COHEN
9190 S DADELAND BLVD
SUITE 1702
MIAMI         FL 33156
305-671-2000
Select Client Center, 800-625-7245
Branch: 877-403-7086

I..II..II.II..I.I..I.II.I..II.I.I..I.I.II.I.II..II

# Summary

We have enclosed statements for the following accounts in your consolidated household. 'Total Value Comparison' and 'Year to Date Summary' may co
information for previously existing accounts which have been recently consolidated. Unpriced securities are not included in the 'Net Value' columns. U
otherwise indicated, values shown are for 'This Period'. Accrued interest and dividends, earned but not paid, are excluded from the Adjusted Net Value.
Asset increase is defined as: Adjusted Net Value This Period-Adjusted Net Value Prior Month-Deposits + Withdrawals-Income.

| Account Number | Abbreviated Name | Account Type | Total Value Prior Month/ Adj.Net Value | Total Value This Period Adj.Net Value | Net Securities Deposited/ Withdrawn | Net Capital Deposited/ Withdrawn | Total Income Tracked (Decrease) | Asset Increase/ (Decrease) | Unrealized Gain or (Loss) | Adjusted Gain or |
|---|---|---|---|---|---|---|---|---|---|---|
| MR CONRAD DESANTIS  AND MRS PATRICIA DESANTIS  JTWROS | SELECT | $ 34,960.55 $ 34,970.45 | $ 37,033.17 $ 37,002.79 | $ 0.00 | $ 0.00 | $ 10.03 $ 0.00 | $ 2,004.73 | $ 13,874,026 | $ 8,364, $ 0. |

## Current Total Asset Allocation Summary

18.4% Cash

81.6% Equities

## Total Value Comparison



Units in multiples of 1 thousand

| Year to Date Summary | |
|---|---|
| Beginning total net value as of 12/31/04 | $ 71,007.90 |
| Net security deposits/withdrawals (year to date) | 0.00 |
| Net cash deposits/withdrawals (year to date) | 0.00 |
| Total income (year to date) | 62.26 |
| Asset increase/(decrease) (year to date) | (34,000.07) |
| Beginning total net value/ Adjusted net value as of 11/01/05 | $ 37,033.17 $ 37,002.79 |
| Year to date total return | (34,004.11) |

# EXHIBIT "B"

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CORDELL FUNDING, LLLP,                    CASE NO. 502007CA006416 AG
      Plaintiff,

v.

CONRAD J. DESANTIS,
      Defendant/Counter-Plaintiff,
_____/

## STIPULATION FOR SETTLEMENT AND ENTRY OF JUDGMENT

    1.    The parties agree to the resolution of the pending litigation between Cordell Funding, LLLP ("Cordell" or "Plaintiff"), Robin Rodriguez, Conrad DeSantis and for the dismissal of the Third Party Action against Joseph Simmons et al. North Andros Assets, Ltd. ("NAAL") joins in stipulation to bind it to the actions required.

    2.    An Order finding DeSantis liable on his personal guaranty to Cordell shall be entered forthwith. That Order will state that DeSantis is jointly and severally liable with NAAL up to the amount of the judgment described in paragraph "3" below. The Order shall provide that all affirmative defenses, counterclaims and third party claims against Rodriguez are dismissed with prejudice and rights of appeal are waived, but that judgment shall be entered only in accordance with the terms of this Stipulation and Paragraph 4 below.

    3.    Plaintiff shall exercise its power of sale on the property. The proceeds of the sale will be used to pay down NAAL's debt to Cordell, including principal of $4,000,000.00 from the two mortgage loans, accumulated interest as well as costs and attorney's fees as provided in the Loan Documents. Interest shall be calculated at the respective rates, including default rates of interest as set forth in the respective mortgage notes and the Loan Contract. Attorney's fees shall consist of fees paid to Cordell's attorneys in Florida and the Bahamas. It is expressly agreed that the total amount due from Conrad J. DeSantis as of May 4, 2009 is $5,410,563.52 and that he has no liability on the $500,000 mortgage loan which he did not personally guaranty.

    4.    On January 31, 2010, or thereafter at the convenience of the plaintiff, a deficiency judgment equivalent to the then outstanding balance of the Cordell loan to NAAL, if any, including principal of $3,500,000, accumulated interests and attorney's fees as provided in the Loan Documents but not including the $500,000 loan which Conrad J. DeSantis did not personally guaranty, may be entered against Conrad J. DeSantis provided, however, that any such deficiency judgment shall not exceed Two Million Five Hundred Thousand Dollars ($2,500,000.00). Thereafter, post judgment interest shall accrue on the judgment at the statutory rate. It is the goal of the parties that the sale of NAAL's assets will be sufficient to satisfy the debt owed by NAAL to plaintiff. DeSantis' liability as a guarantor of that debt shall be limited to Two Million Five Hundred Thousand Dollars. To the extent that when Plaintiff exercises it's power of sale it receives more than the amount due to Plaintiff under the Loan Documents including all of Plaintiff's costs, then the excess shall be paid to NAAL. The amount of the

Cordell Funding, LLLP v. Conrad DeSantis
Settlement Agreement
Page 2

judgment against DeSantis does not limit or impact the liability of NAAL to Cordell, which shall include all principal, interest, costs, expenses and legal fees as provided in the Loan Documents.

So long as it is permissible under Bahamian law and will not prevent or delay the foreclosure proceedings in the Bahamas or plaintiff's power of sale, the parties further agree as follows: In the event Plaintiff is the high bidder when it exercises its power of sale, Plaintiff will give NAAL a 60 day option to buy the property back from it for the total amount owed to Plaintiff under the Loan Documents plus interest from the date of the sale until the closing at 20% per annum.

5.      The calculation of monies owed to Cordell shall include but are not limited to: (i) carrying costs borne by Cordell; (ii) costs of sale; (iii) payments of attorney's fees incurred as provided in the Loan Documents; (iv) payments of taxes, fees and assessments both in connection with carrying the property, sale of the property and obtaining Bahamian governmental approvals as needed; (v) costs of marketing the collateral; (vi) costs of improvements necessary to complete construction and sell the condominium units; (vii) costs of maintaining and operating the collateral prior to closing on a sale thereof; (viii) government fees, taxes, transfer taxes, surcharges and the expense of complying therewith. The net sum obtained by Cordell as sales proceeds, after deduction of the foregoing shall be applied to the gross debt owed by NAAL. Notwithstanding the foregoing, plaintiff may enter judgment in the amount of up to $2,500,000.00 as provided in paragraph "4" above if at least that much remains due and owing to Cordell by NAAL.

6.      DeSantis and NAAL agree that: (i) the Notes and Mortgages between NAAL and Cordell are valid and enforceable; (ii) NAAL is liable for the principal, interest, costs and attorney's fees sought by Cordell in the Bahamian litigation; (iii) NAAL has no claims or defenses pertaining to Cordell's action for foreclosure or its exercise of power of sale in the Bahamas.

7.      The net proceeds of sale of NAAL's assets shall be applied to the NAAL debt as follows: (i) first to reimburse plaintiff for its expenses including all costs and attorney's fees as provided in the Loan Documents; (ii) then to be applied to accrued interest on the $500,000.00 Note created in 2006; (iii) then to the principal of the $500,000.00 note; (iv) then to the accrued interest on the $3,500,000.00 loan; (v) then to be applied to principal portion of the $3,500,000.00 loan.

8.      DeSantis shall be responsible for the payment of his own attorney's fees and costs.

9.      DeSantis shall not delay, impair or obstruct the foreclosure action or exercise of power of sale in the Bahamas, directly or indirectly, personally or through third persons. Should

Cordell Funding, LLLP v. Conrad DeSantis
Settlement Agreement
Page 3


DeSantis fail to cooperate in Cordell's efforts to foreclose, the judgment referred to above shall
be entered immediately and DeSantis shall be liable for all further damages.


10.    DeSantis will dismiss with prejudice the Third Party Action herein as to Joe Simmons
and Joel Jenkins, but without prejudice as to Phillip Galanis.

_____          _____
Conrad J. DeSantis, Defendant             Gerald Richman, Esq., Attorney for Defendant


_____          _____
North Andros Assets, Ltd.                 North Andros Assets, Ltd.
By its President and Director             By its Director Conrad DeSantis
Joseph Simmons


_____          _____
Cordell Funding, LLLP                     Irwin R. Gilbert, Esq., Attorney for Plaintiff
By its Managing Partner


_____          _____
Robin Rodriguez, Individually             Joseph Simmons, Individually
Individually

Cordell Funding, LLLP v. Conrad DeSantis
Settlement Agreement
Page 3

DeSantis fail to cooperate in Cordell's efforts to foreclose, the judgment referred to above shall be entered immediately and DeSantis shall be liable for all further damages.

10.    DeSantis will dismiss with prejudice the Third Party Action herein as to Joe Simmons and Joel Jenkins, but without prejudice as to Phillip Galanis.


_____                    _____
Conrad J. DeSantis, Defendant                Gerald Richman, Esq., Attorney for Defendant


_____                    _____
North Andros Assets, Ltd.                    North Andros Assets, Ltd.
By its President and Director                By its Director Conrad DeSantis
Joseph Simmons


_____                    _____
Cordell Funding, LLLP                        Irwin R. Gilbert, Esq., Attorney for Plaintiff
By its Managing Partner


_____                    _____
Robin Rodriguez, Individually                Joseph Simmons, Individually
Individually

☑0006/0006

10.    DeSantis will dismiss with prejudice the Third Party Action herein as to Joe Simmons and Joel Jenkins, but without prejudice as to Phillip Galanis.

| | |
|---|---|
| Conrad J. DeSantis, Defendant Defendant | Gerald F. Richman, Esq., Attorney for |
| North Andros Assets, Ltd. By its President and Director Joseph Simmons | North Andros Assets, Ltd. By its Director Conrad DeSantis |
| Cordell Funding, LLLP | Irwin R. Gilbert, Esq., |
| Robin Rodriguez | Joseph Simmons, individually |

3

# EXHIBIT "C"

CFN 20150274733
OR BK 27691 PG 1503
RECORDED 07/24/2015 09:04:28
Palm Beach County, Florida
AMT
Sharon R. Bock
CLERK & COMPTROLLER
Pgs 1503-1518; (16Pgs)

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO.: 502007CA006416XXXXAG

CORDELL FUNDING, LLP., a Florida Limited
Liability Limited Partnership,

       Plaintiff

v.

CONRAD J. DESANTIS,

     Defendant.

_____/

## ORDER ON PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT
## AND FINAL JUDGMENT IN FAVOR OF PLAINTIFF

    **THIS CAUSE** came before the court on Plaintiff Cordell Funding, LLP's, Motion to

Enter Final Judgment against Defendant, Conrad J. DeSantis.  The court heard testimony and

argument during hearings held on May 6, 2014, August 5-6, 2014, and January 6-8, 2015.

Having heard the evidence and considered the argument of counsel, the court hereby finds as

follows:

## INTRODUCTION

    The instant case involves a settlement agreement regarding a property located in the

Bahamas.  Plaintiff made a loan of $3,500,000.00 to North Andros Assets, Ltd. ("NAAL"),

which NAAL put towards acquiring the property in the Bahamas.  In return, the Defendant

executed a written personal guarantee.  After NAAL defaulted on its debt, NAAL, Plaintiff, and

Defendant entered into a settlement agreement regarding the sale of the property and satisfaction

of the debt.  Plaintiff now claims that it sold the property pursuant to the terms of the agreement,

CFN 20150274733
BOOK 27691 PAGE 1504
2 OF 16

and seeks a deficiency judgment of $2,500,000.00 against Defendant. Defendant argues that the sale was improper and did not comply with the agreement, and therefore it would be inequitable to award the deficiency judgment against him.

## FACTUAL BACKGROUND

### A. Loan to NAAL and Defendant's Guaranty

In December 2005, Plaintiff, Cordell Funding, LLP, made a loan of $3,500,000.00 to North Andros Assets, Ltd. ("NAAL").[1] Defendant, Conrad DeSantis executed a written personal guarantee of the loan. The loan proceeds were used to acquire certain real property in the Bahamas that has been known by a variety of names, most recently, "The Palm at West Bay" (referred to herein as "the Property"). At the time the loan was signed, Defendant owned 90% of NAAL's stock, which shares he pledged as collateral for the loan by entering into an Indenture of Charge Over Shares in NAAL ("Indenture"). Pursuant to the Indenture, Defendant's shares were to be held in escrow until such time as NAAL defaulted, at which time Plaintiff had the right to remove the shares from escrow.

### B. Default and the Settlement Agreement

NAAL subsequently defaulted on its debt, and in April 2007, Plaintiff commenced an action against Defendant to enforce the terms of the guarantee. Plaintiff removed Defendant's shares from escrow and assumed control. Plaintiff voted to place Joseph Simmons as Director, President, Treasurer, and Secretary of NAAL.

On December 16, 2009, NAAL, Plaintiff, and Defendant entered into a Stipulation for Settlement ("Settlement Agreement"), in which Defendant and NAAL acknowledged the validity of the underlying notes and Defendant's guaranty. Defendant and NAAL also acknowledged

---

[1] Plaintiff later loaned NAAL an additional $50,000.00, but Defendant did not personally guarantee this loan.

2

CFN 20190274733
BOOK 27691 PAGE 1505
3 OF 16

liability and waived defenses, counterclaims and set-off claims. Plaintiff agreed to undertake to sell the Property. While Plaintiff arranged the sale, the loan would continue to accrue interest and expenses. Further, the terms of the Settlement Agreement provided that (1) the total amount owed by Defendant to Plaintiff as of May 4, 2009, was $5,410,563.52; (2) Defendant would relinquish any control of the Property to Plaintiff; (3) Defendant would not interfere with the sale of the Property; and (4) Defendant would not be personally liable for any deficiency judgment beyond $2,500,000.00. The Settlement Agreement also required that "[i]n the event Plaintiff is the high bidder when it exercises its power of sale, Plaintiff will give NAAL a 60 day option to buy the property back from it for the total amount owed to Plaintiff under the Loan Documents plus interest from the date of the sale until closing at 20% per annum." The court approved the Settlement Agreement in an Order entered on July 27, 2009.

**C. Sale of the Property**

Prior to entering into the Settlement Agreement, NAAL had entered into an agreement with Allure (Bahamas), Ltd. ("Allure") whereby Allure came into control of the Property. The agreement between NAAL and Allure did not require Allure to satisfy the underlying mortgage debt owed to Plaintiff as it sold condominium units, and Plaintiff therefore refused to consent to the NAAL/Allure agreement. The Property subsequently became steeped in litigation in both the Bahamian and American courts. At different times between 2009 and 2010, Bahamian courts entered injunctions against the sale of the Property or appointed a Receiver to control it, impairing any effort to market or sell.

Eventually, the aforesaid litigation waned and Plaintiff was able to take control of the Property at some point in 2010. At that time, the construction on the property was unfinished, and the buildings had been vandalized and exposed to the elements. James Mosko, an

3

CFN 20150274733
BOOK 27691 PAGE 1506
4 OF 16

experienced builder/developer in the Bahamas, testified that the quality of the construction of the subject units by Allure and the condition of the building was extremely poor requiring significant repairs. Mr. Mosko also testified that the plumbing and electrical fixtures as well as flooring, molding and other improvements had been ripped out of the structure, causing significant damage in many of the units. Elbert Thompson, an appraiser in the Bahamas with H.G. Christie, confirmed this description of the property. Both witnesses credibly testified that the condition of the property likewise severely impaired a sale. Furthermore, several witnesses testified that the history of litigation surrounding the Property placed a "cloud" over it, further impairing its marketability.

After the Property had been restored to marketable condition, Plaintiff began seeking purchasers. In marketing the Property for sale, Plaintiff entered into listing agreements with three different real estate brokers in the Bahamas: (1) H.G. Christie; (2) Mario Carey Realty; and (3) Mosko Group of Companies. These brokers, along with Plaintiff, erected signs on the property, established a website and promoted a sale of the property in newspaper advertisements in the United States and Canada. Plaintiff complied with the advice of the respective brokers in terms of how to market the property and obtain the highest price. One of Plaintiff's managing partners, Robin Rodriguez, also testified that he contacted numerous parties with whom he had done business in an effort to find a buyer. None of these efforts were successful.

Plaintiff subsequently elected to pursue a private sale rather than an auction of the property. Defendant's expert, Lynden Obafemi Pindling, a Bahamian attorney, testified that a lender exercising the "power of sale" could choose to enter into a private sale and was not obliged to conduct an auction.[2]  Mr. Pindling testified that in view of English common law

---

[2] Mr. Pindling also observed that real estate sales at auction in the Bahamas were viewed as a

CFN 20150274733
BOOK 27691 PAGE 1507
5 OF 16

precedent, the lender was obliged to seek out advice from real estate professionals, such as H.G. Christie and Mario Carey Realty and follow their advice in order to meet the lender's obligations to the debtor.

Defendant testified that he communicated with a prospective buyer by the name of David Kosoy in the Bahamas, who made an offer for the Property and was referred to Mr. Rodriguez. According to the Defendant, Mr. Rodriguez reportedly rejected the Kosoy offer as inadequate. Defendant also testified that he agreed that the offer was too low to accept. Mr. Rodriguez testified that Mr. Simmons had referred Mr. Kosoy to him, but that Mr. Kosoy made no offer in any amount at the time. Regardless, this factual disparity is immaterial because Defendant testified that the terms of a sale to Mr. Kosoy at that time were not agreeable to him.

According to Mr. Rodriguez, over time, the Plaintiff became concerned that it was not possible to market the real property so long as a perception prevailed that the property was subject to further legal claims by third parties. Mr. Rodriguez testified that he came to understand that "unimpeachable title" could be obtained if Plaintiff used its power of sale to sell the property to a single purpose entity formed by Plaintiff for this purpose. Mr. Pindling, Defendant's legal expert, confirmed that such a sale or transfer in fact did create such "unimpeachable title."

Accordingly, on July 18, 2013, Plaintiff transferred title to the Property to "The Palm at West Bay, Ltd.", a company controlled by the same managers as Plaintiff. For the purpose of the transfer, Plaintiff credited NAAL with a sale price of $9,000,000.00. According to Mr. Rodriguez, Cordell chose the $9,000,000.00 transfer price in order to avoid disputes with the guarantors of NAAL's debt. Subsequently, in July 2014, The Palm at West Bay, Ltd. entered

---

method of distress sale and generally would be expected to result in a lower sale price as compared to a non-distress, non-liquidation private sale.

CFN 20150274733
BOOK 27691 PAGE 1508
6 OF 16

into an arm's length sale of the Property to Sterling Financial, Inc., a company controlled by Mr. Kosoy. The gross sale price was $4,500,000.00. However, the seller was required to bear the cost of the sales commissions, closing costs and government transfer taxes. As such, the net sale price was $3,493,736.50. Based on these two transactions, Mr. Pindling opined that the Plaintiff failed to meet its obligations in exercising its power of sale during the first sale to The Palm at West Bay, Ltd. However, Mr. Pindling further opined that Plaintiff's efforts in exercising its power of sale in the second sale to Mr. Kosoy's Sterling Financial, Inc., satisfied Plaintiff's obligations under English common law.

## LEGAL ANALYSIS AND RULING

Plaintiff claims that between the two transactions, it sold the Property pursuant to the terms of the Settlement Agreement. Although Plaintiff essentially sold the Property for a gross sale price of $4,500,000.00, it has credited NAAL with the initial $9,000,000.00 sale price. Even so, Plaintiff claims that the remaining deficiency significantly exceeds the $2,500,000.00 cap set forth in the Settlement Agreement, and therefore seeks a deficiency judgment of $2,500,000.00 against the Defendant. Conversely, the Defendant argues that such judgment should not be awarded because (1) the method of the sale breached the Settlement Agreement, and (2) such an award would be inequitable.[3]

### A. Defendant's Breach of Settlement Agreement Claims

The Settlement Agreement provided that (1) Plaintiff would exercise its "power of sale" under Bahamian law, and (2) "[i]n the event Plaintiff is the high bidder when it exercises its power of sale, Plaintiff will give NAAL a 60 day option to buy the property back from it for the

---

[3] In the course of the present proceedings, the Defendant has raised numerous assertions and arguments pertaining to events that preceded the Settlement Agreement. However, since the Settlement Agreement and the related Order bar such arguments and assertions, the court declines to analyze or address those contentions here.

CFN 20150274733
BOOK 27691 PAGE 1509
7 OF 16

total amount owed to Plaintiff under the Loan Documents plus interest. Based on these provisions, the Defendant raises a variety of arguments as to why Plaintiff's actions in the sale of the Property should be considered as breaching the Settlement Agreement. The court finds that the Stipulation for Settlement is a valid enforceable agreement between the parties.

The interpretation of settlement agreements is governed by the rules for interpretation of contracts. *Hanson v. Maxfield*, 23 So. 3d 736 (Fla. 1st DCA 2009). Where a contract's terms are clear and unambiguous, the "language itself is the best evidence of the parties' intent and its plain meaning controls." *Palm Beach Pain Management, Inc. v. Carroll*, 7 So. 3d 1144, 1145 (Fla. 4th DCA 2009). Accordingly, in the absence of any evidence that the parties intended to endow a term with special meaning, unambiguous language must be given a realistic interpretation based on the plain, everyday meaning of the words. *Sheets v. Palmer*, 917 So. 2d 246 (Fla. 1st DCA 2005). Further, in construing the terms of a settlement agreement, the court must review the entire instrument and to give effect to every provision. *Philip Morris Inc. v. French*, 897 So. 2d 480 (Fla. 3d DCA 2004). "If an agreement is ambiguous, the court should follow a construction that best comports with logic, reason, and the purposes underlying the parties' agreement." *Id.* However, where the language is clear and unambiguous, the court may not indulge in construction or modification and the express terms of the settlement agreement control. *See Hernandez v. Gil*, 958 So. 2d 390 (Fla. 3d DCA 2007).

### 1. Sale to The Palm at West Bay, Ltd.

Plaintiff claims that between the two transactions, it sold the Property pursuant to the terms of the Settlement Agreement, which required Plaintiff to exercise its power of sale. The Defendant argues, however, that Plaintiff breached this provision of the Settlement Agreement

because the first sale to The Palm at West Bay, Ltd. was not a proper exercise of the power of sale, as no funds changed hands and it was not an arm's length sale.

Mr. Pindling, a Bahamian attorney, testified as to the requirements inherent in exercising a power of sale in the Bahamas. The exercise of a "power of sale" is not a foreclosure. Rather, it is the exercise of a mortgagee's right to satisfy the underlying debt associated with a mortgage lien by selling the real property under mortgage. The holder of the mortgage on the property could then exercise its "power of sale" and convey title directly to a buyer. Mr. Pindling also testified that a lender exercising the "power of sale" is not obliged to conduct an auction, but must seek out advice from real estate professionals and follow their advice in order to meet the lender's obligations to the debtor.

While Plaintiff was obligated by the Settlement Agreement to arrange a sale of the Property, any sale necessitated finding a ready, willing and able buyer. The court received credible testimony from several witnesses as to major obstacles relating to the marketing of the subject property. Mr. Rodriguez testified that neither Plaintiff nor NAAL could obtain access to the property in 2009 in order to show it to prospective buyers. This was confirmed by the testimony of Mr. Thompson. Once Plaintiff was able to gain access in 2010, testimony indicated that the Property was in very poor condition, which impaired its marketability. Additionally, several witnesses testified that the lengthy history of litigation surrounding the Property placed a "cloud" over it, further impairing its marketability.

To remedy the latter issue, Plaintiff sought the advice of multiple real estate professionals and, based on their advice, engaged in the first transaction, that being the sale to The Palm at West Bay, Ltd. Mr. Rodriguez testified that Plaintiff advanced a loan of $9,000,000.00 to The Palm at West Bay, Ltd. to fund the sale. He acknowledged that the new entity was created for

8

the purpose of acquiring title to the Property and is an affiliate of Plaintiff. If this had been the only sale, Mr. Pindling opined that he would consider Plaintiff to have failed to meet its obligations in exercising its power of sale. However, this was not the only sale. In July of 2014, the Property was sold in an indisputably arm's length sale to Sterling Financial Group, Inc. Based on this second sale, Mr. Pindling opined that Plaintiff's efforts in exercising its power of sale in the second sale satisfied Plaintiff's obligations under Bahamian law.

The court finds that Plaintiff acted in good faith and in a reasonable manner to acquire control of the physical premises, effectuate repairs, list and market the Property for sale in accordance with its obligations under the written agreements of the parties and in accord with its obligations as a lender exercising its power of sale. Plaintiff complied with the advice of the respective brokers in terms of how to market the property and obtain the highest price. The court also finds that Plaintiff had the right to seek the maximum recovery from the sale of the premises so as to recover the debt. This warranted an orderly non-distress sale of the Property.

Further, the court finds that the value of the Property when sold in 2013 was $5,600,000.00, and the value when sold in 2014 was $4,500,000.00. Accordingly, the sale for $9,000,000.00 was well above the Property's value at that time. The Defendant argues that the sale price of $9,000,000.00 was less than the fair market value of the property. However, the Plaintiff presented evidence as to the fair market value on July 18, 2013 in the form of a written appraisal by Mr. Mosko and another appraisal by Mr. Thompson. Both appraisers testified as to the method of calculating that value. Both opinions of value were substantially less than $9,000,000.00. The Defendant did not present evidence of the fair market value of the real property in July of 2013 or July of 2014. Such evidence would have had to be presented by the Defendant for him to credibly contest the fair market value of the property.

9

The Defendant argues that based on the nature of the sale to The Palm at West Bay, Ltd., the court should find that the Plaintiff failed to properly exercise its power of sale. However, if the court were to accept that this first sale was unauthorized or not a sale at all, at most the first sale would be treated as a nullity. After the first sale, Plaintiff credited Defendant $9,000,000.00. Plaintiff did not decrease that credit even though the second sale price was only $4,500,000.00 with an even lower gross sale price. Accordingly, if the court were to treat the first sale as a nullity, Defendant's liability to Plaintiff would not decrease. Rather, the deficit would increase by more than $4,500,000.00. Thus, in the absence of any evidence that the Plaintiff avoided an opportunity to close a sale for a higher price to a different entity, the Defendant is not damaged in any fashion by the sale. Accordingly, the court finds that the Defendant has failed to demonstrate that Plaintiff breached the Settlement Agreement by failing to properly exercise its power of sale.

## 2. Timing of Exercising the Power of Sale

The Defendant also argues that Plaintiff should have exercised its power of sale sooner, and, moreover, made insufficient efforts to find a buyer in order to increase the Defendant's debt. The Plaintiff counters that it undertook reasonable efforts to sell the Property in good faith, and any delay in finding a ready, willing, and able buyer was due to ongoing litigation, the economic climate, and the condition of the Property. Indeed, Plaintiff presented testimony that even following the Settlement Agreement, the Property remained subject to litigation in both American and Bahamian courts. At different times between 2009 and 2010, Bahamian courts entered injunctions against the sale of the Property or appointed a receiver to control it, thereby impairing any effort to market or sell. It was not until some point in 2010 that the litigation waned and Plaintiff was able to take control of the Property. Mr. Rodriguez testified that once

10

Plaintiff was finally able to access the Property, it discovered that the Property was not in marketable condition. Construction on the Property had remained unfinished, and the buildings had been vandalized and exposed to the elements for several years. Plaintiff undertook repairs necessary to market the Property.

Even after Plaintiff restored the condition of the Property enough to begin marketing it, Plaintiff was unable to find a buyer. The Property was advertised and was listed with several brokers. Mr. Rodriguez also reached out to potential buyers. The one possible buyer that came forward did not make a sufficient offer. Eventually, Plaintiff, seeking to attract buyers, took the advice of one of the Property's brokers and conducted the first sale to The Palm at West Bay, Ltd. Around six months later, the Property was sold.

The court accepts and finds that the Plaintiff's actions constituted good faith efforts to sell the Property. The court rejects the suggestion by the Defendant that the recession that commenced in 2008 had no effect on the Bahamian real estate market. Accordingly, the court finds that the Defendant has failed to demonstrate that the delay in finding a buyer for the Property constituted a breach of the Settlement Agreement.

### 3. Failure to Hold an Auction

The Defendant next argues that the Settlement Agreement required Plaintiff to sell the Property through an auction and afford NAAL a right of first refusal. Thus, according to the Defendant, since the Plaintiff sold the Property via private sale, Plaintiff breached the Settlement Agreement. The Plaintiff counters that the language of the Settlement Agreement does not mandate a sale via auction.

In the absence of any evidence that the parties intended to endow a term with special meaning, unambiguous language must be given a realistic interpretation based on the plain,

11

CFN 20160274733
BOOK 27691 PAGE 1514
12 OF 16

everyday meaning of the words. *Sheets*, 917 So. 2d at 246. Additionally, the court should interpret the agreement as a whole, giving effect to all of its provisions and avoiding absurd constructions. *See Ospina-Baraya v. Heiligers*, 909 So. 2d 465, 472 (Fla. 4th DCA 2005). If the agreement is ambiguous, the court should construe it in a manner that best comports with logic, reason, and the underlying purposes of the agreement. *Philip Morris Inc.*, 897 So. 2d at 480.

Defendant cites to a provision in the Settlement Agreement which states, "[i]n the event Plaintiff is the high bidder when it exercises its power of sale, Plaintiff will give NAAL a 60 day option to buy the property back from it." Defendant asserts that the term "high bidder" must be construed to require Plaintiff to sell the property by means of an auction rather than a private sale. However, contrary to Defendant's claims, this provision does not require Plaintiff to exercise its power of sale via auction. It merely states that "in the event" that Plaintiff is the high bidder at an auction for the sale of the Property, it must afford NAAL the buy-back period. It does not require that the power of sale be exercised through auction.

Indeed, the Settlement Agreement contains no indication that the parties intended to require an auction. There is no other mention of an auction, much less that one is required. Additionally, the use of the term "power of sale" under Bahamian law does not imply such a requirement. Mr. Pindling testified that a lender exercising the "power of sale" could choose to enter into a private sale and was not obliged to conduct an auction. Moreover, such a limiting interpretation would be contrary to the goals of the Settlement Agreement, which sought to best advance the sale of the Property. Had the parties intended to regulate the method of sale, it should have been reflected in the terms of the written Stipulation. Accordingly, the court finds that the contested provision does not require sale via auction. As the sale was compliant with the

12

CFN 20150274733
BOOK 27691 PAGE 1515
13 OF 16

requirements for exercise of a power of sale, Defendant has failed to demonstrate that the failure to hold an auction constituted a breach of the Settlement Agreement.

### 4. Failure to Afford NAAL a 60-Day Buy-Back Period

Defendant also asserts that Plaintiff breached the Settlement Agreement by not abiding by the obligation to afford NAAL the opportunity to acquire the property for the same price, i.e. $9,000,000.00. As discussed above, Plaintiff was not required to hold an auction. The buy-back provision specifically applied only in the event of an auction. As the Property was sold in a private sale, the buy-back period therefore did not apply. Accordingly, Defendant has failed to demonstrate a breach of the Settlement Agreement.

Even if this provision did apply, the Settlement Agreement did not create a right of first refusal for Defendant – it afforded this opportunity exclusively to NAAL. Defendant has not shown that either he or NAAL was ready, willing, or able to purchase the real property at any price. Further, Mr. Rodriguez testified that he gave notice of the sale of the Property to Mr. Simmons, President of NAAL. NAAL was therefore afforded notice and should have exercised its rights of first refusal if it desired to and had the means to do so. There is no evidence contradicting Mr. Rodriguez' testimony and no evidence that NAAL sought to exercise any right of first refusal.

### 5. De Facto Merger

Defendant also argues that a "merger" occurred between Plaintiff, as the mortgagee of the Property, and NAAL, as the mortgagor. According to Defendant, this merger arose when Plaintiff exercised its right to vote Defendant's shares of NAAL which it held in trust. Plaintiff voted the shares as a trustee pursuant to an earlier agreement in order to remove certain directors and officers and place Mr. Simmons as President and Director. Defendant argues that this

"cancelled the debt" associated with the mortgage notes. In essence, DeSantis argues that he lost his shares in NAAL.

In the course of the evidentiary hearings, the court received in evidence (1) a resolution purporting to vote the shares of NAAL to remove certain directors and appoint others, and (2) a consent signed by the Defendant as a Director of NAAL. As part of the collateral and security for the loan, NAAL's shareholders placed their shares into a 'trust' and granted certain powers to the lender. However, the agreement doing so, the "Charge Over Shares," at section 3.3, made clear that the lien over the shares did not impact liability for the indebtedness to NAAL:

> Any receipt, release or discharge of any security created by this charge or any liability arising under this charge, may be given by the chargee in accordance with the provisions of this charge, and shall not release or discharge the chargor from any liability to the chargee, for the same or any other monies which may exist independently of this charge.

Accordingly, Defendant has failed to demonstrate that a de facto merger took place. Additionally, the court has considered and takes judicial notice of the Post-Trial Order on Issue of Merger and the Final Judgment entered by the U.S. District Court for the Southern District of Florida in *Cordell Funding, LLP v. Joel Jenkins*, Case No. 9:11-cv-80900-KLR. While the court recognizes that this Order is not binding, it finds it persuasive on this point.

## B. Defendant's Equity Claims

Defendant argues that the instant case is an equity case rather than a law case, insisting that he is entitled to equitable defenses which would preclude or mitigate entry of judgment against him. Defendant argues that the court should find that the fair market value of the real property exceeded the indebtedness owed to Cordell. However, in this case the court does not sit in equity, as it involves the enforcement of a written agreement. This case does not involve a judgment of foreclosure or a post-foreclosure sale.

14

CFN 20150274733
BOOK 27691 PAGE 1517
15 OF 16

Regardless, the court concludes that the equity defense pertaining to deficiency judgments would not provide assistance to the Defendant. In determining the amount of a deficiency judgment, the court first looks to the amount paid for the mortgaged property. *Mizner Bank v. Adib*, 588 So. 2d 325 (Fla. 4th DCA 1991). The borrower may then assert and prove that the sale price was less than the "fair market value" of the property. *Id.* If the borrower is able to prove that the "fair market value" is a higher number, the deficiency judgment may be lowered appropriately. *Id.* The "fair market value" is determined as of the date of the sale and no other date. *Id.* Thus, the burden is on the defendant to prove that the fair market value of the property exceeded the sale price on the date of sale. Here, the Defendant has failed to make any such showing, and therefore would not be assisted by an equity defense. Accordingly, it is hereby

**ORDERED** that Plaintiff's Notice of Supplemental Authority and Request to Take Judicial Notice, filed on March 6, 2015, is **GRANTED**. It is further

**ORDERED AND ADJUDGED** that final judgment is entered in favor of Plaintiff. Accordingly, **LET JUDGMENT ENTER** AGAINST DEFENDANT, CONRAD DESANTIS, as follows:

1. Judgment in the amount of $2,500,000.00 together with taxable costs awarded against Defendant, Conrad DeSantis, in favor of Plaintiff.

2. Plaintiff is found to be the prevailing party for the purpose of attorney's fees under the terms of the loan documents. Plaintiff shall file a written motion to establish the amount of those attorney's fees within thirty (30) days.

3. Plaintiff shall likewise move to fix costs within thirty (30) days.

4. The court retains jurisdiction for motions pertaining to attorney's fees and costs and for any further proceedings as may be appropriate and necessary.

15

5.    Let judgment enter and execution be had thereon.

**DONE AND ORDERED** in West Palm Beach, Palm Beach County, Florida, this ___ day of July, 2015.

_____
DONALD W. HAFELE
CIRCUIT JUDGE

Copies to:

Irwin R. Gilbert, Esq., 1000 Prosperity Farms Rd., Suite 205, Palm Beach Gardens, FL 33410

Gerald F. Richman, Esq., 250 Australian Ave. S., Ste. 1504, West Palm Beach, FL 33401

16